IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CR 125-069 |
| | ) | |
| LARRY LEMONSHEU JENKINS | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Defendant, charged with possession with intent to distribute methamphetamine and cocaine and several firearms offenses, seeks to suppress evidence obtained during searches of his vehicle on February 29, 2024, and March 11, 2024.  After carefully considering the entire record, including testimony, exhibits, and arguments presented during the hearing on March 4, 2026, the Court **REPORTS** and **RECOMMENDS** Defendant's motion to suppress be **DENIED** as to the fruits of the February 29th search, and **GRANTED** as to the fruits of the March 11th search.  (Doc. no. 17.)

## I.    INTRODUCTION

On February 29, 2024, Sergeant Megan Inman and Investigator John Tarpley from the Richmond County Sheriff's Office arrested Defendant for drug trafficking, illegal firearms possession, and theft.  (Doc. no. 17-3, "Police Report.")  At the time of his arrest, officers conducted a warrantless search of Defendant's car, a black Nissan Maxima, and seized methamphetamine, powder cocaine, crack cocaine, fentanyl pills, marijuana products, a digital scale, and twelve firearms.  (Id. at 2, 3-7.)  Inv. Tarpley seized an additional firearm during a second search on March 11, 2024.  (Id. at 8.)  "The government concedes that the March 11,

2024 warrantless search of Defendant's vehicle and location of additional contraband should be suppressed." (Doc. no. 20, p. 4.) The government did not indict Defendant with any offenses involving this firearm. (Id. at 4 n.2, 9; see also doc. no. 1.)

Defendant argues a warrant was required for the February 29th search because the Maxima was parked within the curtilage of Defendant's residence or business, and there was no probable cause. (See doc. nos. 17, 32.) The arrest and search took place at 2705 Mike Padgett Highway, a parcel that is adjacent to 2701 Mike Padget Highway ("2701 and 2705 parcels"). (Doc. no. 17, pp. 2-5; doc. nos. 17-1, 17-2.) Both parcels were jointly owned by Defendant, his sister, and his brother-in-law. (See Transcript, doc. no. 28, pp. 118-19 ("Tr."); doc. nos. 17-1, 17-2.) Defendant operated Augusta Tune Up & Brake, a car repair shop, on the 2701 parcel at the corner of Mike Padgett Highway and Lumpkin Road. (Tr. 12-13, 44.) Situated on the 2705 parcel on the date of arrest were two connected modular buildings, two commercial trucks, a dumpster, and multiple cars. (Tr. 23-24; see also Def. Ex. 3.) One of the two connected modular buildings on the 2705 parcel is tan in color, and Defendant claims this building was his residence at the time of his arrest. (Tr. 106-07; see also doc. no. 17, p. 7.) A line of junk cars, parked side-by-side, partially separated the parcels. (Doc. no. 17, p. 3.)

In his motion to suppress, Defendant provided the following two images from Richmond County records showing the general layout and overall condition of the two parcels. (Doc. no. 17, pp. 2, 3; see also Def. Exs. 1 & 2.)

2





Also helpful is an image showing Defendant's alleged residence, the tan modular buidling, as well as the Maxima and other vehicles on the 2705 parcel at the time of arrest. (Id. at 6; see also Def. Ex. 3.)



Finally, the following image of the tan modular building, and vacant white modular building

connected thereto, is from county property records attached to Defendant's motion as Exhibit

1. (Doc. no. 17-1.)



## II.    SUMMARY OF HEARING TESTIMONY

### A.    Sergeant Megan Inman

Sgt. Inman worked at the Richmond County Sheriff's Office for ten years, and her experience included road patrol, criminal investigations, and jail security. (Tr. 9-10.) She worked in the narcotics division for approximately four and a half years, receiving training on a multitude of drug crime topics and participating in more than one hundred drug investigations. (Tr. 11.) Approximately three weeks before Defendant's arrest, a confidential source told investigators that Defendant was selling large amounts of firearms and drugs out of his Nissan Maxima at his car repair shop. (Tr. 12.) In early February 2024, Sgt. Inman participated in an undercover operation wherein the same confidential source successfully executed a controlled purchase of illegal drugs from Defendant inside of his Maxima on the 2705 parcel. (Tr. 14, 41.) The confidential source parked his car next to Defendant's car and entered Defendant's car on the passenger side, and the drug transaction took no more than five minutes. (Tr. 14-15.)

The investigators conducted approximately ten hours of surveillance of this location over multiple days, and they observed Defendant conduct multiple hand-to-hand drug transactions utilizing the same routine as the controlled purchase. (Tr. 15-18.) Defendant parked his Maxima in the same area on the 2705 parcel, to the left of the car repair shop and to the right of the white box truck, and customers would enter his car for up to five minutes for hand-to-hand transactions of what investigators presumed to be drugs. (Tr. 14-18.) On some occasions, Defendant's car remained parked at the transaction area, and he would walk to the car from the car repair shop to conduct the transactions. (Tr. 14, 19, 21.) On other occasions, Defendant's car would be parked at the car repair shop, and Defendant would utilize

a short path on the shoulder of Mike Padgett Highway to drive from the shop to the transaction area. (Tr. 19; see also Gov't Ex. 6 (picture depicting the gravel pathway).) A row of junk cars partially separated the car repair shop from the transaction area. (Tr. 14; see also doc. no. 17, p. 3.) Sgt. Inman described the transaction area as appearing to be "like an extension of the business." (Tr. 14.)

Investigators observed these transactions from across four or five lanes of Mike Padgett Highway, and while they could not observe the actual drugs and money changing hands, they believed the transactions involved drugs based on the following: (1) the confidential informant's initial tip that Defendant was selling large quantities of drugs from his car in the same manner as investigators observed; (2) the successful controlled purchase with the confidential informant; (3) observations of Defendant transacting quick hand-to-hand exchanges with other people in the same manner and location as the controlled purchase; and (4) the similarities between Defendant's practices and other drug dealers investigated by Sgt. Inman and her team. (Tr. 16-17, 58, 61-64.)

Sgt. Inman and Inv. Tarpley arrested Defendant on February 29, 2024. (Tr. 12.) Just before the arrest, they observed Defendant conducting three or four more of these same quick transactions from his car in the same area of the 2705 parcel. (Tr. 18.) They approached the Maxima during a transaction and as they approached, Sgt. Inman detected the odor of marijuana emanating from the open front passenger door. (Tr. 19-23.) The odor continued to emanate from the passenger door after the officers arrested Defendant. (Tr. 25.) While Sgt. Inman never expressed out loud that she smelled marijuana, she explained she did not say anything because she had no duty to inform Defendant or others of the marijuana smell. (Tr. 29-30.) Sgt. Inman obtained the car keys from Defendant, and her search of the vehicle netted,

as detailed in the police report, methamphetamine, fentanyl, cocaine, crack cocaine, prepackaged THC in gummy form, and multiple firearms. (Tr. 27-28; see also Police Report.)

On the date of Defendant's arrest, the investigators did not realize the car repair shop on the 2701 parcel was located on a separate parcel from the transaction area on the 2705 parcel. (Tr. 18.) A small, tan modular building is located on the 2705 parcel. (Tr. 23-24; see also Gov't Ex. 4.) During their investigation, Sgt. Inman and her team never observed a light on inside of the modular building, and they never saw anyone enter this building. (Tr. 24.) They assumed it was abandoned because there are a lot of abandoned structures on this stretch of the highway. (Tr. 18, 47-48.) Investigators believed Defendant lived offsite because, during the period of surveillance, the Maxima he drove was never parked anywhere on the property, on either parcel, in the mornings before the car repair shop opened. (Tr. 51-52.) Sgt. Inman's team obtained intelligence that Defendant was residing a distance away from the car repair shop and "somewhere off Sibley Road and Gordon Highway area." (Tr. 53.)

On cross-examination, Sgt. Inman conceded the entire investigative file makes no mention of the February 2024 controlled purchase, but Sgt. Inman reiterated the controlled purchase did, in fact, occur and she was present for it. (Tr. 32-33.) Also present for the controlled purchase was Investigator Jessica Weigers. (Tr. 33.) The confidential source purchased either methamphetamine or fentanyl from Defendant, and it tested positive in a field test. (Tr. 41.) The controlled purchase occurred at the beginning of the investigation, and its purpose was to establish probable cause for issuance of a warrant to search Defendant's residence. (Tr. 42.) At the time of the arrest, investigators were conducting surveillance to determine where Defendant lived because most dealers keep the majority of their inventory at home. (Tr. 42-43.) Because she was in the beginning phases of the investigation at the time

7

of the arrest, Sgt. Inman never obtained county records to determine the owner of the property. (Tr. 43-45.)

Sgt. Inman explained that no reports are generated in connection with a controlled purchase, and the only document of any kind typically generated is a property receipt that "usually . . . goes in the back of the case file." (Tr. 36.) When defense counsel explained the case file produced in discovery by the government did not include any such property receipt, Sgt. Inman explained the property receipt is something her department does not typically provide to the state prosecutor in state prosecutions. (Tr. 36.) A typical case file also includes a picture of the cash given to the informant for the controlled purchase, but this picture is also not typically provided to the state prosecutor for discovery. (Tr. 39-40.)

ATF Agent Johnny McDonald introduced Sgt. Inman to the confidential informant, who reported that Defendant "was selling large amounts of narcotics and illegal firearms from his vehicle." (Tr. 37-38.) This was the first time Sgt. Inman and her team had worked with this informant. (Tr. 38, 41.) The controlled purchase was not recorded, and Sgt. Inman and Investigator Weigers surveilled the purchase from a distance. (Tr. 38.)

### B.    Investigator John Tarpley

Inv. Tarpley has been employed by the Richmond County Sheriff's Office for eight years, first on road patrol then crime suppression and narcotics investigations, and is presently employed in the gang unit. (Tr. 67.) He worked in narcotics investigations for three years, and his training includes search and seizure, drug identification, and laboratory testing. (Tr. 67.) Inv. Tarpley assisted in the undercover surveillance of Defendant, and he began work on the investigation after the controlled purchase. (Tr. 69.)

On the date of Defendant's arrest, Inv. Tarpley conducted surveillance for three or four hours from several vantage points across Mike Padgett Highway, at a distance from Defendant's car of approximately ten to fifteen car lengths.  (Tr. 70, 78; see also Gov't Ex. 8 (picture of Inv. Tarpley's last surveillance vantage point).)  During that short time period, he observed three unknown subjects approach Defendant's car, either on foot or in their own vehicle, and enter Defendant's car for only two or three minutes to conduct hand-to-hand transactions with Defendant, who was in the driver's seat.  (Tr. 70.)  On each occasion, Defendant drove his Nissan Maxima on the path from the car repair shop to the other side of the row of junk cars and parked near the box truck on the 2705 parcel.  (Tr. 70; see also Gov't Ex. 6.)  When the transactions were completed, customers left immediately without entering the car repair shop.  (Tr. 70.)

While Inv. Tarpley could not see the drugs and money being exchanged, he concluded Defendant was selling drugs based on the controlled purchase, the short duration of each interaction, and the movements inside of the vehicle.  (Tr. 74.)  In his experience, drug transactions inside vehicles typically take one to five minutes, and Defendant's transactions lasted two to three minutes.  (Tr. 75.)  At the time of the surveillance, Inv. Tarpley was not aware the car repair shop and transaction area were located on two separate parcels.  (Tr. 71.)

When Inv. Tarpley approached the Maxima to make the arrest, Defendant was exiting the vehicle and Inv. Tarpley could smell a very strong odor of marijuana coming from the car.  (Tr. 76-77; see also Gov't Ex. 3 (picture of Inv. Tarpley's truck behind Defendant's Maxima with car repair shop in background).)  At the time of Defendant's arrest, Inv. Tarpley estimated Defendant's Maxima was about five car lengths, measured from bumper to bumper, from the tan building.  (Tr. 80, 89-90.)  During surveillance, Inv. Tarpley never saw Defendant or

anyone enter the tan modular building, and he never saw the Maxima parked any closer to this building than five car lengths, the approximate distance at the time of arrest. (Tr. 78, 86.)  He never observed any lights on inside the tan modular building, or any mail or packages delivered to it.  (Tr. 78-79.)  After arresting Defendant, Inv. Tarpley and Sgt. Inman searched Defendant's car and seized methamphetamine, fentanyl pills, cocaine, marijuana, and multiple firearms.  (Tr. 80-81.)  They did not search the tan modular building because it was never a focus of the investigation.  (Tr. 97.)

Richmond County investigators track money used in controlled purchases by photographing the government funds, but there is no requirement to place these photos in the case file.  (Tr. 92-93.)  When a controlled purchase is made, investigators generate a money receipt that lists informant name, target name, address, description of the purchased drugs, and property receipt number.  (Tr. 102-03.)  The money receipt is stored in a locker with access limited to one supervisor.  (Tr. 102.)  Each month, a second supervisor checks the receipts to ensure funds expended equals funds disbursed.  (Tr. 103.)  A separate property receipt references the money receipt and is attached to the seized drugs, which are stored in the property room.  (Tr. 103-04.)

## C.   Defendant Larry Jenkins

The tan modular building was Defendant's residence at the time of the investigation and arrest. (Tr. 106-07.) He is a co-owner with his sister of the 2705 parcel where this building is situated.  (Tr. 108, 119.)  At the time of his arrest and continuing through the present, this building contained a bed, love seat, and sofa.  (Tr. 107-108; Def. Exs. 4, 5, 6 (pictures of furniture in the tan modular building).)  At the time of his arrest, there was a U-Haul truck parked on the 2705 parcel that was purportedly stolen, and Defendant disavowed any

involvement. (Tr. 109.)  Also located on the 2705 parcel at the time was a passenger truck that belonged to Defendant's father, as well as the white box truck that was owned by Defendant and used to store personal items.  (Tr. 109, 132-33; see also Def. Ex. 7 (picture showing passenger truck, U-Haul, and tan building.)

With respect to the junk cars, Defendant parked them in a line to create a fence to separate the car repair shop from the 2705 parcel. (Tr. 109-10.)  He also placed a no trespassing sign on the 2705 parcel near the boundary to prevent customers from entering the 2705 parcel. (Tr. 110, 123.)  The defense did not offer a picture of this sign into evidence. (Tr. 124.)  The 2705 parcel has a mailbox, and mail is delivered to it.  (Tr. 110.)  In approximately 2014 or 2016, Defendant gave a false name and date of birth to a police officer during a traffic stop. (Tr. 111.)

On cross examination, Defendant testified he lived on Acapulco Drive a long time ago and moved at an unspecified time from his mother's home on McNutt Road to the tan modular building. (Tr. 112.)  While the tan modular building contained a couch, love seat, bed, and Defendant's clothing, he had no other personal effects in the building, "just the bare necessities." (Tr. 112-13.)  The prosecutor played body worn camera footage from the arrest showing Defendant's cousin carrying boxes of Defendant's personal items, taken from Defendant's car during the search, toward the car repair shop and away from the tan modular building. (Tr. 117-18.)  When asked why the cousin did not take these items to the tan modular building if this was Defendant's residence, Defendant testified his cousin "doesn't come around that often" and "doesn't know where I stay." (Tr. 118.)  Defendant has never conducted activity on the 2705 parcel for his car repair shop. (Tr. 119.)  When asked about a commercial dumpster located on the 2705 parcel at the time of his arrest, Defendant explained he rented it

when remodeling the modular building, and only he used the dumpster.  (Tr. 121; see also Gov't Ex. 5 (picture of Defendant with blue commercial dumpster and car repair shop in the background).)

Answering questions posed by the undersigned, Defendant testified the modular building has a bathroom, kitchen sink, air fryer, and refrigerator, but it does not have a stove or microwave.  (Tr. 127-29.)  Defendant's father purchased the 2705 parcel, and the tan modular building was already there at the time of purchase.  (Tr. 129, 134.)  It was not intended to be a residence, but Defendant moved there to reduce instances of burglary.  (Tr. 129.)  Just before moving into the tan modular building, Defendant lived at his mother's house on McNutt Road.  (Tr. 130-31.)  He moved into the modular building approximately six to seven months before his arrest.  (Tr. 131-32.)  Before he moved, the tan modular building was empty and not used for any purpose.  (Tr. 138.)

There was a Chevrolet Tahoe and white box truck parked on the 2705 parcel at the time of Defendant's arrest.  (Tr. 132; see also Gov't Ex. 4 (picture of Tahoe and white box truck).)  Both belonged to Defendant, and he used the white box truck to store "knick-knacks."  (Tr. 132.)  Another building adjoins the tan modular building.  (Tr. 133-34.)  It is vacant and has been since Defendant's deceased father first bought the property.  (Tr. 134.)  When asked how someone would know, in the weeks leading up to Defendant's arrest, the tan modular building was being used as a residence, Defendant testified, "[T]he only way you would know is if you would actually come knock on the door and see if I was there."  (Tr. 135.)  Defendant also conceded that anyone approaching the two parcels would have no meaningful way to distinguish one from the other.  (Tr. 135.)

12

### III.    DISCUSSION

Defendant argues evidence from the first warrantless car search on February 29, 2024, should be suppressed because there was no probable cause and the Maxima was parked within the curtilage of Defendant's residence or business.  (See doc. nos. 17, 32.)  As explained below, the government has proven by a preponderance of the evidence there was probable cause and the automobile exception to the warrant requirement applies because Defendant's car was not within the curtilage of his home.  (See doc. nos. 20, 31.)

#### A.    Probable Cause

An officer must generally obtain either consent or a warrant based on probable cause before conducting a search.  United States v. Tamari, 454 F.3d 1259, 1261 (11th Cir. 2006).  However, "agents may conduct a warrantless search of a vehicle if (1) the vehicle is readily mobile (i.e., operational); and (2) agents have probable cause to believe the vehicle contains contraband or evidence of a crime."  Id.  The government bears the burden of proving by a preponderance of the evidence that a warrantless search falls within an exception to the warrant requirement.  Nix v. Williams, 467 U.S. 431, 444 (1984); United States v. Freire, 710 F.2d 1515, 1519 (11th Cir. 1983); United States v. Maldonado Cardenas, No. 2:18-CR-0411, 2018 WL 7283627, at *2 (N.D. Ala. Nov. 19, 2018), *adopted sub nom by* United States v. Cardenas, No. 218CR00411, 2019 WL 140953 (N.D. Ala. Jan. 9, 2019).

The sole inquiry here is probable cause because Defendant does not contend his car was inoperable, and the indisputable evidence show it was readily mobile.  "To determine whether probable cause exists, we perform an objective analysis that does not account for the subjective beliefs of law enforcement."  United States v. Williams, 731 F. App'x 863, 867 (11th Cir. 2018) (*per curiam*) (citing United States v. Franklin, 694 F.3d 1, 9 (11th Cir. 2012)).

Probable cause exists when there is "a fair probability that contraband or evidence of a crime will be found." United States v. Sokolow, 490 U.S. 1, 6 (1989) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).

Any reasonable person would find such a fair probability existed at the time of Defendant's arrest. Indeed, investigators had ample probable cause to search Defendant's car based on (1) the confidential informant's tip; (2) the successful controlled purchase utilizing the same informant; (3) hours of surveillance after the controlled purchase in which investigators saw Defendant utilize the same methods and practices in multiple additional transactions; and (4) the strong odor of marijuana emanating from Defendant's car as investigators approached and arrested Defendant.

Controlled buys provide a firm foundation for a finding of probable cause. See, e.g., United States v. Prather, 279 F. App'x 761, 765-66 (11th Cir. 2008) (*per curiam*) (finding probable cause for search warrants where affidavits contained facts regarding recent controlled buys of drugs and arrests of persons exiting residence to be searched who possessed drugs); United States v. Wells, CR 305-006, 2005 WL 2237630, at *2 (S.D. Ga. Aug. 19, 2005) ("There is no stronger evidence that the defendant was storing and selling cocaine from his residence and the residence across the street than a controlled purchase of cocaine from the defendant at the location of the search warrants."), *adopted by* CR 305-006, doc. no. 19 (S.D. Ga. Sept. 12, 2005); United States v. Mobley, 808 F. App'x 899, 902 (11th Cir. 2020) (*per curiam*) (affirming automobile exception applied where defendant arrived at a controlled buy in vehicle at issue and defendant seen exiting vehicle with firearm at controlled buys).

So does the odor of marijuana. United States v. Rivera, 595 F.2d 1095, 1099 (5th Cir. 1979)[1] (citing United States v. Ogden, 572 F.2d 501, 502 (5th Cir. 1978) (*per curiam*)); United States v. Garza, 539 F.2d 381, 382 (5th Cir. 1976) (*per curiam*) ("[T]he odor of marijuana emanating from the vehicle gave the officer probable cause to conduct [a] search."); see also United States v. Stancil, 4 F.4th 1193, 1199 (11th Cir. 2021) (explaining marijuana smell emanating from vehicle provides probable cause to search vehicle); Adams v. Officer of Governor, 818 F. App'x 887, 889 (11th Cir. 2020) (*per curiam*) (same); United States v. Tobin, 923 F.2d 1506, 1512 (11th Cir. 1991) ("There is no doubt that the agent's suspicions rose to the level of probable cause when, as the door stood open, he detected what he knew from his law enforcement experience to be the odor of marijuana."); United States v. Smith, 596 F. App'x 804, 807 (11th Cir. 2015) (*per curiam*) (recognizing smell of fresh marijuana coming from inside car provides probable cause to conduct warrantless search of same).

For these reasons, the government has carried its burden of proving probable cause by a preponderance of the evidence.

## B.      The Search Did Not Occur Within the Curtilage

"The automobile exception to the Fourth Amendment does not permit a police officer, 'uninvited and without a warrant, to enter the curtilage of a home in order to search a vehicle parked therein.'" United States v. Bruce, 977 F.3d 1112, 1121 (11th Cir. 2020) (quoting Collins v. Virginia, 584 U.S. 586, 589 (2018)). Curtilage is "the area immediately surrounding and associated with the home" that is considered "part of the home itself for Fourth

---

[1] Under Bonner v. City of Prichard, the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions that were handed down prior to the close of business on September 30, 1981. 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

Amendment purposes." Collins, 584 U.S. at 592  (cleaned up).  "The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened." Id. (cleaned up).  Examples include the front porch, an area just outside the front window, a side garden, a driveway area abutting the home, and any such areas "beyond where a neighbor would venture, in an area intimately linked to the home where privacy expectations are most heightened." Collins, 584 U.S. at 593-94, 597 n.3 (cleaned up); see also United States v. Delva, 922 F.3d 1228, 1245 (11th Cir. 2019).

"'[T]he extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself.'" United States v. Taylor, 458 F.3d 1201, 1206 (11th Cir. 2006) (quoting United States v. Dunn, 480 U.S. 294, 300 (1987)).  In Dunn, the Supreme Court identified four factors to assist courts in resolving this question:  (1) proximity of the area to the home; (2) nature of the uses to which the area is put; (3) whether the area is included within an enclosure surrounding the home; and (4) steps taken by the resident to protect the area from observation. Taylor, 458 F.3d at 1206 (citing Dunn, 480 U.S. at 301).  Here, although the first factor weighs slightly in favor of Defendant, the remaining three factors all heavily weigh in favor of a finding that Defendant's car was parked outside the curtilage of the tan modular building at the time of Defendant's arrest.

The first factor weighs slightly in favor of Defendant because his car was parked adjacent to and at a distance estimated to be roughly five car lengths from the tan modular building.  (Tr. 80; see also Gov't Ex. 7.)  "An area that is substantially removed from and separated by other structures from the house is not within its curtilage." Taylor, 458 F.3d at

16

1207.  Notably, "[i]n terms of distance, '[n]either the Supreme Court nor the Eleventh Circuit has defined, in numerical . . . terms, the phrase "close proximity.""" United States v. Jennings, No. 21-CR-60193, 2021 WL 5235292, at *6 (S.D. Fla. Nov. 10, 2021) (quoting United States v. Garrott, 745 F. Supp. 2d 1206, 1209 (M.D. Ala. 2010)).  However, the Eleventh Circuit has concluded a car parked at a distance of three to four car lengths from a house was "not far" for purposes of the first factor.  See United States v. Stephen, 823 F. App'x 751, 755 (11th Cir. 2020) (per curiam) (concluding the first Dunn factor "provide[d] some support" for defendant's argument, but the remaining factors weighed against him).  Thus, it is fair to conclude Defendant's Maxima, parked roughly five car lengths away,[2] is similarly not far from the tan building.  However, as the government's Exhibits 4 and 7 and defense Exhibit 3 show, a commercial storage truck and Tahoe were parked between the Maxima and the building.  Although neither the storage truck nor Tahoe are separate structures, they do spatially separate the Maxima from the tan modular building.  Nonetheless, as a whole, this factor slightly favors Defendant.

Second, the nature of the uses of this area weighs heavily against Defendant.  "An area is more likely to be within the curtilage of a home if it is 'used for intimate activities of the home.'" United States v. Noriega, 676 F.3d 1252, 1262 (11th Cir. 2012) (quoting Taylor, 458 F.3d at 1207 (internal quotations omitted)).  Here, Defendant did not use the area where the Maxima was parked for intimate activities connected with the home.  Rather, the entire 2705 parcel is filled with indicia of commercial use, from the line of junk cars to the commercial

---

[2] Inv. Tarpley testified the Maxima was about five car lengths away from the tan building.  (Tr. 86, 89-90.)  Based on the Court's review of government's Exhibit 7, it appears the Maxima was closer.  (See Gov't Ex. 7.)  Regardless, even five car lengths weighs in favor of Defendant.

dumpster, to the white box truck and U-Haul truck.  Indeed, as Defendant admitted, he used the 2705 parcel in such a way that anyone approaching the two parcels would have no meaningful way to distinguish the car repair shop parcel from the 2705 parcel.  (Tr. 135.) Nothing about this area suggests any connection to a residence whatsoever, to such an extent that a person with no prior knowledge about the 2705 parcel would be surprised to learn the tan modular building was being used as a home instead of for commercial purposes.  By every appearance, every inch of the 2705 parcel was devoted to commercial rather than residential purposes.

Third, the area where Defendant parked his car at the time of arrest is not included within an enclosure surrounding the tan modular building.  Instead, Defendant parked his car in plain sight and near the shoulder of a five-lane highway.  Fourth, Defendant took no steps to protect this parking area from observation.  While he claims to have installed a no trespassing sign near the boundary of the 2701 parcel to keep car repair shop customers from entering the 2705 parcel, nothing prevented or obstructed anyone traveling on the highway from observing the area where he parked.

For these reasons, the evidence preponderates in favor of finding Defendant's Maxima was not parked within the curtilage of the tan modular building.  It is not an area intimately linked to the home, where privacy expectations are most heightened and a neighbor would not venture.

Citing no cases in support, Defendant argues the curtilage analysis applies to businesses as well as homes.  (Doc. no. 17, pp. 7-8.)  The argument gets Defendant nowhere because the Court has assumed for purposes of this analysis that Defendant did reside in the tan modular building at the time of his arrest, as Defendant testified.  Furthermore, no business curtilage

protection exists because, as the Supreme Court explained in a quote highlighted by the government, (doc. no. 20, p. 8), the automobile exception to the warrant requirement applies when an automobile "is found stationary in a place not regularly used for residential purposes . . . ." California v. Carney, 471 U.S. 386, 392-93 (1985).

Finally, this discussion would be incomplete without mentioning the generosity of the Court's assumption that the tan modular building was Defendant's residence at the time of the arrest. There are serious doubts. Defendant testified he lived in the modular building for only seven months prior to his arrest. This timing is convenient. Investigators never observed any indication of Defendant living there, such that this building was not even a focus of their investigation. Based on their observations and information obtained from other sources, investigators concluded that Defendant lived offsite of the property and only worked there. This conclusion seems reasonable, especially in light of the overall condition and appearance of both parcels. The only evidence offered in support of Plaintiff's contention was his own self-serving testimony and pictures of a barebones interior. Nonetheless, the Court has assumed for its analysis that Defendant resided in this building at the time of his arrest.

## IV.    CONCLUSION

For the above reasons, the Court **REPORTS** and **RECOMMENDS** Defendant's motion to suppress be **DENIED** as to the fruits of the February 29, 2024 vehicle search and **GRANTED** as to the fruits of the March 11, 2024 vehicle search. (Doc. no. 17.)

SO REPORTED and RECOMMENDED this 16th day of June, 2026, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA